816 F.2d 785
 259 U.S.App.D.C. 481
 The NATIONAL LATINO MEDIA COALITION, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Microband Corporation of America, SIN, Inc., Intervenors.
YOUTH NEWS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents.
 Nos. 83-1785, 86-1093.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 16, 1987.
Decided April 28, 1987.
As Amended April 28, 1987.
 
 Petitions for Review of Orders of the Federal Communications commission.
 David Alan Nall, with whom Douglas L. Parker, Craig Iscoe and Andrew Schwartzman, Washington, D.C., were on joint brief for petitioners. Jeffrey H. Olson, Washington, D.C., and Charlotte Rutherford, also entered appearances for petitioners.
 Gregory M. Christopher, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., John J. Powers, III and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on brief for respondents. Bruce E. Fein, Counsel, F.C.C., and Margaret G. Halpern, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Stephen R. Bell and Paul J. Sinderbrand, Washington, D.C., entered appearances for intervenor, Microband Corp. of America, in No. 83-1785.
 
 
 2
 Norman P. Leventhal, Meredith S. Senter, Jr. and Barbara K. Kline, Washington, D.C., entered appearances for intervenor, SIN, Inc., in No. 83-1785.
 
 
 3
 Before BORK and STARR, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge.
 
 
 4
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 5
 The National Latino Media Coalition and several other groups that represent the interests of segments of the viewing and listening public seek review of an action taken by the Federal Communications Commission. That action, which the contending parties variously describe as either an actual rulemaking or a mere statement of policy, was a written announcement that if any of the Commission's comparative proceedings for awarding a telecommunications license should end in a tie, a lottery may be used to award the license between or among the equally qualified applicants. We hold that this announcement is an interpretative rule that does not affect anyone's rights or obligations. As such, it need not be promulgated in accordance with any formal procedures and it is not subject to review by this court at this time.
 
 I.
 
 6
 In 1982, Congress amended the Communications Act of 1934 to allow the Commission to substitute a "system of random selection" (i.e., a lottery) for its traditional method of comparative hearings in awarding certain licenses. See Communications Amendments Act of 1982, Pub.L. No. 97-259, Sec. 115, 96 Stat. 1087, 1094-95 (codified at 47 U.S.C. Sec. 309(i) (1982)). A lottery would provide a speedier and less cumbersome process in situations where many applicants have filed. Noting its concern for encouraging minority representation in the telecommunications industry as a means of increasing diversity of viewpoints, Congress required the Commission to establish rules ensuring that any such lottery will be administered so as to grant "significant preferences" to minority owners and other applicants likely to enhance diversity of viewpoints. 47 U.S.C. Sec. 309(i)(3)(A)(1982).[1]
 
 
 7
 The Commission immediately issued a Notice of Proposed Rulemaking as a first step toward adopting the required rules. Amendment of the Commission's Rules, 91 F.C.C.2d 911 (1982). In addition to promulgating rules to implement the new lottery "systems" in situations governed by the 1982 amendment, the Commission also proposed to use lotteries "on an ad hoc basis in those instances where the qualifications of competing applicants are so close that no material difference between the parties' ability to serve the public interest can be distinguished." Id. at 913. In its subsequent order adopting rules to implement the new statute, however, the Commission declined to implement this latter proposal. See Amendment of the Commission's Rules, 93 F.C.C.2d 952, 959 (1983). In a further order on reconsideration of these issues, the Commission reversed its ground again, revived the proposal for tie-breaker lotteries, and concluded that "there are no legal or procedural grounds for delaying the use of a tie-breaker lottery in an appropriate proceeding." Amendment of the Commission's Rules, 49 Fed. Reg. 49,466, 49,467 (1984). Contrary to its original proposal, however, the Commission here claimed to be acting not under new section 309(i) but under its broad authority to regulate the telecommunications industry "in the public interest." See, e.g., 47 U.S.C. Secs. 303 (g), 309(a) (1982). In these later statements on the proposal, the Commission indicated that it would not incorporate "significant preferences" into any such tie-breaker lottery.
 
 II.
 
 8
 Petitioners characterize the Commission's actions as an attempt to adopt a rule, an attempt that must be invalid since it did not comply with the notice-and-comment requirements in the Administrative Procedure Act. See 5 U.S.C. Sec. 553 (1982). They also allege that the Commission's statements exceeded its statutory authority, since Congress in section 309(i) authorized only the use of lotteries that are structured to grant "significant preferences."
 
 
 9
 We think, however, that the Commission's statements do not amount to adoption of a "legislative rule," which is a rule that is intended to have and does have the force of law. A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute. When Congress delegates rulemaking authority to an agency, and the agency adopts legislative rules, the agency stands in the place of Congress and makes law. An "interpretative" rule, by contrast, does not contain new substance of its own but merely expresses the agency's understanding of a congressional statute. See Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C.Cir.1952) ("Generally speaking, it seems to be established that 'regulations,' 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means."). Thus an interpretative rule does not have the force of law and is not binding on anyone, including the courts, though the status conferred on an agency as the delegate of Congress and by its expertise often leads courts to defer to the agency's interpretation of its governing statute. See Joseph v. United States Civil Serv. Comm'n, 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977) ("Legislative rules have the full force of law and are binding on a court subject only to review under an arbitrary and capricious standard. Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise."); see also Batterton v. Francis, 432 U.S. 416, 424-26 & n. 9, 97 S.Ct. 2399, 2404-06 & n. 9, 53 L.Ed.2d 448 (1977) (same). See generally 2 K. Davis, Administrative Law Treatise Secs. 7:5-:15 (1979) (discussing legislative and interpretative rules). The subject of judicial deference to agency views is clarified in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 10
 Whether an agency has acted by legislative rule or interpretative rule turns not on "the nature of the questions they address but the authority and intent with which they are issued and the resulting effect on the power of a court to depart from the decision embodied in the rule." Joseph, 554 F.2d at 1153 n. 24. "The agency's express purpose may be to establish a binding rule of law not subject to challenge in particular cases. On the other hand, the agency may intend merely to publish a policy guideline that is subject to complete attack before it is finally applied in future cases." Pacific Gas & Elec. Co. v. FPC, 506 F.2d 33, 39 (D.C.Cir.1974); see also Doe v. Hampton, 566 F.2d 265, 280-81 (D.C.Cir.1977) (whether an agency provision is binding depends on "the Commission's intent in authoring it, as ascertained by an examination of the provision's language, its context, and any available extrinsic evidence").[2]
 
 
 11
 In this case, the Commission did not establish any procedure requiring tie-breaker lotteries to be held in any future comparative proceeding. The Commission simply stated and explained its view that if any comparative proceeding were to end in a tie, the holding of a tie-breaker lottery "would not contravene" any part of its governing statute. 49 Fed. Reg. at 49,467. It opined that "such a situation," which has never yet occurred, "would leave the Commission no choice but to conduct a lottery or other type of tie-breaker to avoid arbitrary or capricious action." Id. In perhaps its strongest statements on the matter, the Commission concluded that "there are no legal or procedural grounds for delaying the use of a tie-breaker lottery in an appropriate proceeding," stating a belief that "it is appropriate for Administrative Law Judges to certify that the ultimate choice among applicants should be made randomly where two or more applicants are tied." Id. & n. 6. These statements merely present an interpretation of the agency's governing statute. They do not bind the Commission ever to conduct a tie-breaker lottery. They do not presently affect the rights and obligations of any license applicant or of anyone else. They merely serve notice that the Commission believes that it may, in some future proceeding, resolve a tie by random selection if one should ever occur. Cf. Airport Comm'n v. Civil Aeronautics Bd., 300 F.2d 185, 187-88 (4th Cir.1962) (finding a similar announcement to be a "general statement of policy" that "did not in and of itself operate to deny any rights").
 
 
 12
 The distinction between legislative rules and interpretative rules, as we have indicated, has long been recognized. The Administrative Procedure Act expressly states that publication of notice and opportunity for comment are not required for "interpretative rules" or "general statements of policy." 5 U.S.C. Sec. 553(b)(3)(A)(1982). Thus our determination that the Commission's statements here amount to an interpretative rule disposes of petitioners' contention that the statements could not be made without notice and comment. No such requirements were applicable. There is some suggestion in the case law that fairness should necessitate notice-and-comment procedures for any interpretative rule that has a "substantial impact" on people's legal rights. See, e.g., Pickus v. United States Bd. of Parole, 507 F.2d 1107, 1112-13 (D.C.Cir.1974); Thompson v. Washington, 497 F.2d 626, 640-41 (D.C.Cir.1973). The Supreme Court may have rejected this view when it stated that "reviewing courts are generally not free to impose [procedural rights beyond those conferred by statute] if the agencies have not chosen to grant them." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978); see Energy Reserves Group, Inc. v. Department of Energy, 589 F.2d 1082, 1091-98 (Temp.Emer.Ct.App. 1978) (applying Vermont Yankee ). However that may be, we need not consider that issue here, for the Commission's statements do not have a substantial impact on anyone at all. Thus notice and comment were not required.
 
 
 13
 Because the Commission's statements amounted to an interpretative rule of such limited effect, we also concluded that at this point we may not consider any of the other challenges petitioners have made to this rule. As we have explained, the Commission has not bound itself ever to hold a tie-breaker lottery. If it ever does so, it "may choose to follow prior practice and allow the parties to comment on the proposed use of a lottery or other alternative tie-breaker approaches." 49 Fed.Reg. at 49,467. And if a tie-breaker lottery is used to resolve some future proceeding, the aggrieved applicant at that time will be fully able to seek review of the Commission's actions in this court. Given these facts, "only the strongest showing of the immediate and inescapable effect of the mere announcement of the [agency's] interpretation ... would suffice to advance review to the abstract stage at which it is now being sought." National Ass'n of Ins. Agents, Inc. v. Board of Governors, 489 F.2d 1268, 1271 (D.C.Cir.1974) (per curiam) (denying review of an interpretative rule as "premature").
 
 
 14
 Petitioners argue that these statements create present harm because the Commission, by raising the "new" possibility of a tied outcome, may encourage administrative law judges to be lax in making the rigorous and detailed comparisons that are necessary to distinguish among rival applicants in a comparative hearing. They also assert that this possibility may have a demoralizing effect on potential applicants. We think these allegations are not ripe for review.
 
 
 15
 The Supreme Court has said that in the setting of judicial review of administrative action, the ripeness doctrine is intended to "prevent the courts ... from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). In determining when agency action is ripe for review, Abbott Laboratories requires us "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515. The Court applied that test in Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), a companion case to Abbott Laboratories, in a decision we find controlling here.
 
 
 16
 In Toilet Goods, cosmetics manufacturers claimed that the Commissioner of Food and Drugs acted beyond his statutory authority in issuing certain regulations. The Supreme Court found that the issuance of the regulations was a final agency action, and that the petitioners had framed a purely legal question for review. Nonetheless, the Court found that the issue was not fit for review, in part because
 
 
 17
 [t]he regulation serves notice only that the Commissioner may under certain circumstances order inspection of certain facilities and data, and that further certification of additives may be refused to those who decline to permit a duly authorized inspection until they have complied in that regard. At this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order.... We believe that judicial appraisal of these factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here.
 
 
 18
 387 U.S. at 163-64, 87 S.Ct. at 1524-25 (emphasis in original). In assessing the hardship to the parties from denial of review, the Court said that "[t]his is not a situation in which primary conduct is affected--when contracts must be negotiated, ingredients tested or substituted, or special records compiled." Id. at 164, 87 S.Ct. at 1524. Thus, the Court concluded that "only minimal, if any, adverse consequences will face petitioners" if review were delayed until the regulations were applied and their consequences known. Id. at 165-66, 87 S.Ct. at 1525-26.
 
 
 19
 We think Toilet Goods governs our case. In challenging the Commission's authority to promulgate this interpretative rule, petitioners have framed a purely legal question. But the rule indicates only that the Commission may hold a lottery to break a tie if one should occur. To adapt the Court's statement from Toilet Goods, "[a]t this juncture we have no idea whether or when such [a lottery] will be ordered and what reasons the Commission[ ] will give to justify the [lottery]." 387 U.S. at 163, 87 S.Ct. at 1524. If indeed a tie-breaker lottery does occur because an administrative law judge is not sufficiently rigorous in determining that applicants are equally qualified to receive a license, any wronged applicant will then be able to seek a remedy before the Commission or, if need be, in this court. As for the claim that potential applicants will be demoralized, and thus deterred from seeking a license, by the possibility that a lottery will be used to resolve a tied outcome, this hypothetical injury is at worst implausible and at best "not a situation in which primary conduct is affected." See id. at 164-66. This court has stated that, "to be ripe for review an administrative action must impose an actual, not a prospective hardship by creating a dilemma in which a party 'must choose between disadvantageous compliance and risking serious penalties' for noncompliance." Alascom, Inc. v. FCC, 727 F.2d 1212, 1218-19 (D.C.Cir.1984) (quoting 4 K. Davis, Administrative Law Treatise Sec. 25.6, at 369 (1983)). We find this challenge not ripe for review both because it is unfit for judicial decision and because denial of review will impose no real hardship on the petitioners. The petitions are, therefore,
 
 
 20
 Denied.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)(1982)
 
 
 [1]
 Congress had actually enacted a similar statute in 1981. See Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, Sec. 1242, 95 Stat. 357, 736-37. When the Commission refused to adopt rules implementing the 1981 statute, contending that it was ambiguous and unworkable, Congress enacted substantially similar provisions in the 1982 statute
 
 
 [2]
 There is some suggestion in the case law that although an interpretative rule or statement of policy does not bind the courts or private parties, it may bind the agency itself, or at least limit its discretion to act. See Morton v. Ruiz, 415 U.S. 199, 231-37, 94 S.Ct. 1055, 1072-75, 39 L.Ed.2d 270 (1974); Doe v. Hampton, 566 F.2d 265, 280-81 (D.C.Cir.1977); Mazaleski v. Treusdell, 562 F.2d 701, 717-19 (D.C.Cir.1977). But see Dixon v. United States, 381 U.S. 68, 73-75, 85 S.Ct. 1301, 1304-06 14 L.Ed.2d 223 (1965); Sullivan v. United States, 348 U.S. 170, 172-73, 75 S.Ct. 182, 184-85, 99 L.Ed. 210 (1954). To the extent that the conflicting cases can be harmonized, they seem to state no principle different from the one we have just stated in the text: the "binding" quality of a particular rule or statement will depend on whether the agency intended to establish a "substantive" rule, one which is not merely interpretative but which creates or modifies rights that can be enforced against the agency