**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**BOSTON FARM CENTER, INC., a corporation, and James R. Gordon, an Individual, Defendants-Appellees.**

No. 78–1175.

United States Court of Appeals,
Fifth Circuit.

Feb. 23, 1979.

Denver L. Rampey, U. S. Atty., Richard E. Nettum, Asst. U. S. Atty., Macon, Ga., Charles H. Johnson, Asst. Chief Counsel for Enforcement, Richard M. Cooper, Chief Counsel, Stuart M. Pape, Associate Chief Counsel for Foods, Food & Drug Administration, Rockville, Md., William D. Coston, Barry Grossman, John H. Shenefield, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for the U. S.

Harry J. Altman, II, Thomasville, Ga., for defendants-appellees.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Not often does this Court deal with disputes in which the judgment is easier to pronounce than the name of the matter in controversy, but this is such a case. Our problem involves aflatoxin, a metabolic by-product of the polysyllabic mold aspergillus flavus, but our solution is a by-product of monosyllabic words and logic.

Boston Farm Center, appellee, is a grain distributor in Boston, Georgia. On November 22, 1977, the United States, appellant, applied for an injunction under section 302 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 332(a), (the "Act"), seeking to halt the Center's interstate shipment of corn containing more than 20 parts per billion (ppb) of the substance aflatoxin.

Section 301(a) prohibits the interstate shipment of "adulterated" food. Adulterated food is defined as, among other things, food containing "any poisonous or deleterious substance which may render it injurious to health." 21 U.S.C. § 342(a)(1). The lower court issued a preliminary injunction against the Center, but enjoined only the Center's interstate shipment of corn containing more than 100 ppb of aflatoxin. The United States appealed the judgment of the lower court arguing that the injunction threshold should be set at the 20 ppb level it requested.

The 20 ppb level proposed by the Government is the Food and Drug Administration's "action level" for aflatoxin in corn. An action level, to be defined properly, must be explained in the broader context of the FDA's general regulatory scheme. In implementing the Act, the FDA either may adopt formal regulations, 21 U.S.C. § 346, or may litigate alleged violations on a case-by-case basis. Although the Act makes illegal any amount of substance which "may render (food) injurious to health" 21 U.S.C. § 342(a)(1) the FDA is not required to seek to enjoin, prosecute or otherwise litigate "minor violations" of the Act. 21 U.S.C. § 336. To guide its prosecutorial discretion in the bringing of non-rule enforcements of the Act the FDA may establish certain in-house guidelines called action levels. Since 1969 the action level for aflatoxin in corn has been 20 ppb. This means that since 1969 the FDA's internal policy has been to try to prevent the shipment of corn containing more than 20 ppb of aflatoxin, but not of corn containing 20 ppb or less.

The FDA argues that the court should defer to this action level because it represents the expert, technical judgment of the agency. The government argues in its brief that, "[a]lthough not a regulation, an action level represents the agency's considered judgment as to the level of a contaminant that can be permitted in food without significant risk to public health or to the fitness of food for consumption." In essence, the government implies with such terms as "the agency's considered judgment" that a court should defer to an action level much as it defers to an agency regulation. Indeed, some cases approach this position. See e. g., U. S. v. 484 Bags, More or Less, 423 F.2d 839, 842 (5th Cir. 1970), and Dean Rubber Manufacturing Co. v. U. S., 356 F.2d 161 (8th Cir. 1966). We accept this argument for deference to the agency but only up to a point. The deference principle is less compelling when the agency threshold is a matter of prosecutorial discretion

instead of rule-making. Congress requires considerably more fact-finding due process, most especially full notice and comment, in agency rule-making than in agency prosecutorial discretion.[1] The fuller rule-making due process serves the purposes of accuracy and fairness. When an agency proceeds in non-rule case-by-case adjudication, much of the fact-finding process is shifted to the courts. The purposes of accuracy and fairness require that the courts not slavishly defer to the agency's in house prosecutorial guidelines arrived at without benefit of even minimal due process protections. At the extreme, the deference argument in this context sets up the blocking for an end run by the agency of the procedural checks in the statute for formal rule-making.

Nevertheless, in this circuit we have evolved a policy of considerable deference to agency action levels. Thus, in U. S. v. 484 Bags, More or Less, 423 F.2d 839, 842 (5th Cir. 1970), we wrote: [The District Court]

> may accept as a judicial standard the allowable tolerances now permitted by the Secretary, whether published or not. A court may apply a stricter standard than the Secretary and hold a food substance adulterated though within the Secretary's tolerances. Considering the positive command of the statute, the power of the court to allow a greater departure from purity than the administrative tolerances is less certain.

We need not decide in this case "the power of the Court to allow a greater departure from purity than the administrative tolerance" because we find that the facts in this case are so one-sided that any finding of non-adulteration for amounts of aflatoxin between 20 ppb and 100 ppb would be clearly erroneous. Thus, even if the court were to afford no deference whatsoever to the action level set by the agency—that is, even if the court were to make a wholly independent decision as to whether the Bos-

---

1. For example, FDA regulations state that the agency may take regulatory action "any time after an action level is established and need not await publication of the notice." 21 C.F.R. § 109.4(b)(2). See also 21 C.F.R. § 509.4(b)(2). And see U. S. v. 484 Bags, More or Less, 423 F.2d 839 (5th Cir. 1970) (action level not yet published when litigation initiated).

ton Farm corn was adulterated—it would still be clearly erroneous on this record to find that amounts of aflatoxin between 20 and 100 ppb do not adulterate corn. Only one expert testified before the lower court on the potential hazardousness of aflatoxin. That expert, Dr. Rodricks, testified that "there is no known level of exposure which can be considered safe, without risk to people." (Transcript, p. 29.) Dr. Rodricks cited numerous studies to support this expert opinion, including one showing the adverse effects of aflatoxin in doses as low as 15 ppb. (Tr. 25, Govt. exhibit 2, paragraph 5(b)). In addition, Dr. Rodricks testified that aflatoxin accumulates in body tissue. Thus, without statistics showing the amount of long term consumption of corn by livestock and by humans, it makes little sense to draw any bright line between doses of aflatoxin which "may" render food injurious to health and doses which are not possibly dangerous.[2]

Aside from Dr. Rodricks' expert testimony, there was no other evidence in this record on the question of the potential harmfulness of aflatoxin. Appellees presented no evidence on the question and did not elicit from Dr. Rodricks during cross-examination any contradictory evidence on this question. Certainly there is no evidence in the Record to support the Court's assertion that "there is controversy concerning the validity of this determination, it being contended by some that injury to health is not likely unless the content exceeds approximately 400 parts per billion (ppb)."[3]

As a result, we find the lower court was clearly erroneous in finding that amounts of aflatoxin between 20 and 100 ppb do not render corn adulterated.[4]

We want to emphasize the limited nature of our ruling today. To an extent the statutory scheme permits the FDA to adopt a relatively ad hoc case-by-case approach to

---

**2.** At best one might make distinctions on the basis of "public interest" policies, but Congress has vested such discretion in the Secretary. 21 U.S.C. § 336.

**3.** Appellees argue that the 20 ppb threshold is an arbitrary figure set by the FDA solely because it is the smallest amount of aflatoxin that can be measured. But the Record shows that the FDA kept the level at 20 ppb even after it was able to measure lower amounts. Unrebutted evidence in the Record shows that the FDA could identify aflatoxin at levels of 1–5 ppb as early as 1973, (Govt. Exhibit 2, ¶ 6) and that the agency lowered the level for peanuts to 15 ppb in 1974. 39 *Fed.Reg.* 42748 (December 6, 1974). Moreover, it is not clear why setting a threshold at the lowest measurable amount of a poison considered dangerous in any amount is improper or irrational.

**4.** Two other arguments raised by the parties should be discussed briefly.

First, appellees argue that this appeal of an order concerning only corn harvested in 1977 should be dismissed on grounds of mootness. The argument fails on two grounds. There is no evidence in this Record indicating that Boston Farm Center has disposed of all its corn from the 1977 season. And even if Boston Farm had disposed of that corn this case presents a classic example of the controversy that is "capable of repetition, yet evading review"—a common exception to the mootness doctrine. *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498,

515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). See also *Roe v. Wade*, 410 U.S. 113, 124–125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

Second, appellants argue that the lower court applied the wrong test in defining "adulterated" food. Specifically, appellants point to the following statement in the Court's opinion: "[C]orn containing an aflatoxin level of less than 100 ppb does not contain a deleterious substance to the degree which *would* render it injurious to health and, therefore [is] generally acceptable for interstate shipment." (emphasis added). The government argues that this sentence indicates the court limited its injunction on the basis of a "would render" test instead of the "may render" test established in § 342(a)(1): Food is adulterated if it "contains any poisonous or deleterious substance which *may* render it injurious to health." (emphasis added) However, we note that earlier in its opinion the lower court twice correctly quoted § 342 and its "may render" test. The later use of the word "would" in a single conclusory sentence does not necessarily mean that the court did not use the correct § 342 test which it explicitly stated twice before a few paragraphs above. In any case, we do not have to decide this question because we hold that, based on the evidence in the record, it would be clearly erroneous to find that corn containing between 20 and 100 ppb aflatoxin is not adulterated. Thus, the lower court must be reversed whether or not it applied the "may render" test.

regulating the poisons in our food. The statute does not demand rigid and permanent fixity in the numbers game, mainly because our social policies and scientific knowledge about dangerous food are not themselves steady and static. As scientific research and measurement progress, the digits and integers of thresholds, action levels, and tolerances will necessarily change with them. But, in this case the expert evidence is uncontradicted that 20 ppb of aflatoxin may render corn harmful. Other days and other records may yield other figures, but in this case, with this evidence, only one result is possible. The court must enjoin the corn containing more than 20 ppb of aflatoxin.

We remand to the lower court for it to enter an injunction prohibiting Boston Farms from shipping interstate any corn from the 1977 season containing more than 20 ppb aflatoxin.

REVERSED and REMANDED.