## PROFESSIONALS AND PATIENTS FOR CUSTOMIZED CARE, Plaintiff,

v.

## Donna SHALALA, et al., Defendants.

### Civ. A. No. H–92–1499.

United States District Court, S.D. Texas, Houston Division.

April 4, 1994.

John M. Simpson, Fulbright & Jaworski, Washington, DC, for plaintiff.

Daniel David Hu, Asst. U.S. Atty., Houston, TX, Jacqueline H. Eagle, Dept. of Justice, Consumer Litigation, Washington, DC, David J. Horowitz, Food and Drug Admin., Office of the Gen. Counsel, Rockville, MD, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HITTNER, District Judge.

Plaintiff Professionals and Patients for Customized Care ("P2C2") brought this action against the defendants the Food and Drug Administrations ("FDA"), Health and Human Services ("HHS"), and Health Care Financing Administration ("HCFA") challenging the FDA's Compliance Policy Guide ("CPG") 7132.16 as violating the Federal Administrative Procedure Act ("APA"), 5 U.S.C. sections 551 *et seq.* Defendants contend that CPG 7132.16 is a policy statement, not a substantive rule and that it therefore not subject to the requirements of the APA.

P2C2 is an organization of patients and health care professionals, including individuals and entities engaged in the practice of pharmacy whose purpose is to promote an increased awareness and understanding of the importance of pharmacy compounding. Compounding refers to a process whereby a pharmacist combines, mixes, or alters ingredients to create a certain medication for a patient. Compounding has been utilized to provide medications that are not commercially available, such as diluted dosages for children, or to alter the form of a medication for easier consumption.

P2C2 argues that the compliance policy guide in question negatively impacts the practice of pharmacy compounding. P2C2 contends that in implementing CPG 7132.16, the FDA changed its enforcement policy regarding compounded medications without giving those impacted the right to notice and comment.

At trial, P2C2 presented the testimony of practicing pharmacists, Marty Jones ("Jones"), and Marx Gaines ("Gaines") to demonstrate the adverse effect this CPG has had on the pharmacy industry. Both witnesses contended that CPG 7132.16 implemented a new FDA policy toward compounded medications.

Jones, a pharmacist in Jackson, Mississippi and owner of Marty's Discount Pharmacy, testified that compounding constituted twenty to thirty percent of his practice and that he regularly stocked approximately 334 ingredients for use in compounding prior to CPG 7132.16. The FDA issued a warning letter to Jones in July of 1992 noting twenty-one incidents of non-compliance with the Current Good Manufacturing Practices Regulations ("CGMPR") applicable to drug manufacturers pursuant to the Federal Food, Drug, and Cosmetic Act ("FDC Act"), 21 U.S.C. section 321, *et seq.* As a result of the warning letter, Jones ceased compounding medications in advance of a physician's prescription and closed his retail store. Jones stated that he did not believe he could adequately serve his patients without compounding. Jones stated that he discontinued his compounding practice because he feared FDA sanctions.

Gaines, a pharmacist practicing in Thomasville, Georgia, and owner of Trumarx Drugs, testified that he was initially contacted by the FDA in October, 1991 and received a warning letter on January 28, 1992. The warning letter indicated that Gaines was exceeding

the bounds of traditional compounding practice by compounding ophthalmic cromolyn sodium before receiving a prescription for the medication.[1] Gaines testified that he compounded in advance of prescriptions so his patients would not have to wait to receive their medications. As a result of the FDA inspection and warning letter, Gaines stopped compounding ophthalmic cromolyn sodium and deleted references to compounding on his business cards. However, Gaines testified that he continues to compound certain medications for patients without further FDA action. However, Gaines stated that he fears future FDA investigations for compounding medications.

The defendants presented the testimony of Mary Dean Holland, ("Holland"), a clinical pharmacy professor at the University of Illinois Pharmacy School to demonstrate: (1) that CPG 7132.16 does not revise FDA policy toward compounding; (2) that the CPG does not impact the traditional practice of compounding; and (3) the interest the FDA has in closely monitoring the practice of compounding to protect the public. Holland first noted she was taught, as early as the 1970s, that the FDA considered compounded medications to be unapproved drugs. Thus, CPG 7132.16, according to Holland, does not represent a change in the agency's policy regarding compounded drugs.

Holland also presented testimony of the results of her study in compounded medications. The results of the study indicated that fewer than ½ of one percent of prescriptions were filled through compounding. The most commonly compounded medications included dermatological solutions and vaginal suppositories.

Holland expressed concern that compounded medications did not have the same assurances of quality and sterility as commercially available products. According to the results of Holland's study, seven out of ten compounded medications were compounded incorrectly. Holland also testified that according to her research, pharmacists stock an average of only ten ingredients for use in compounding, primarily for dermatological medications. Holland stated that stockpiling 334 ingredients for use in compounding is not a usual practice.[2] Holland noted however, that non-traditional compounding is actually a rare pharmacy practice. According to Holland's study, the majority of pharmacy compounding falls within the definition of "traditional compounding" and is thus not impacted by the CPG. Holland saw little reason to compound commercially available products as there was no quality assurance for the compounded alternative.

The trial in this cause was conducted on October 21 through October 22, 1993. Having considered the parties' proposed findings of fact and conclusions of law, the evidence adduced at the trial, and the applicable law, the Court enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On March 16, 1992, the FDA's Office of Enforcement, Division of Compliance Policy, issued CPG 7132.16, entitled "Manufacture, Distribution, and Promotion of Adulterated, Misbranded, or Unapproved New Drugs for Human Use by State–Licensed Pharmacies."

2. In a Notice of Availability published on March 31, 1992, the FDA stated that it was "issuing CPG 7132.16 to provide *internal guidance* to FDA district officers on when the manufacture, distribution, and promotion of adulterated, misbranded, or unapproved new drugs for human use by State-licensed pharmacies in a manner that is clearly outside the bounds of traditional pharmacy practice [and] may be subject to enforcement actions alleging violations of the [FDC] Act." 57 Fed.Reg. 10906.

3. CPG 7132.16 states in part:

The FDA recognizes that pharmacists traditionally have extemporaneously compounded and manipulated reasonable quantities of drugs upon receipt of a valid prescription for an individually identified

---

1. Evidence adduced at trial indicated that at one time there was a shortage of ophthalmic cromolyn sodium.

2. Evidence at trial indicated that Jones received and stored approximately 334 bulk drugs in his pharmacy for use in compounding.

patient from a licensed practitioner. This traditional activity is not the subject of this CPG.

4. In CPG 7132.16, the FDA distinguishes between pharmacy activities that it would consider to be "traditional extemporaneous compounding" and pharmacy activities that it would consider to be manufacturing.

5. "Traditional Compounding" refers to the practice of extemporaneous compounding by a pharmacist for an individually identified patient upon receipt of a valid prescription from a licensed practitioner. *See* CPG 7132.-16.

6. Pharmacies that engage solely in "traditional compounding" are not the subject of CPG 7132.16.

7. The FDA issues CPGs, including the CPG in issue in this case to provide internal guidance to FDA employees.

8. CPG 7132.16 focuses on drug manufacturing that takes place in pharmacies.

9. In issuing CPG 7132.16 the FDA restated its longstanding position regarding the traditional practice of pharmacy.

10. CPG 7132.16 is concerned with drug manufacturing, not with the extemporaneous compounding of small quantities of drugs.

11. CPG 7132.16 does not state that pharmacies must obtain new drug applications for extemporaneously compounded drugs.

12. There is no general exemption for pharmacies from the provisions of the Federal Food, Drug and Cosmetic Act ("FDC Act"), 21 U.S.C. section 321 *et seq.*, but pharmacies that do not exceed the boundaries of traditional pharmacy practice are exempt from registration, drug listing, and certain inspection requirements of the FDC Act.

13. The FDA bases formal enforcement actions on violations of the FDC Act and not on compliance policy guides.

14. Although extemporaneously compounded drugs are new drugs subject to the FDC Act, the FDA has not traditionally regulated them as new drugs.

15. CPG 7132.16 does not represent a change in the FDA's traditional approach to the regulation of extemporaneously compounded prescription drugs.

16. The FDA issued CPG 7132.16 because the agency determined that an increasing number of pharmacies were manufacturing large quantities of unapproved new drug products, in violation of the FDC Act and claiming that they were exempt from the requirements placed on manufacturers.

17. CPG 7132.16 provides internal guidance for FDA agents and serves only as a policy statement. It is not a substantive rule subject to the requirements of the APA.

18. Manufacturers of new drugs must obtain approved new drug applications, must register with the FDA, must list their drug products with the FDA, and must manufacture according to current good manufacturing practices. 21 U.S.C. § 355 *et seq.*

19. Pharmacies that do not manufacture drugs are not required to register with the FDA and are exempt from certain inspection provisions of the FDC Act.

20. CPG 7132.16 has not had a dramatic effect on pharmacy practice or traditional compounding.

21. The Health Care Financing Administration (HCFA) does not routinely pay for prescription drugs for outpatient use under Medicare.

22. When Medicare does cover prescription drugs, HCFA has a longstanding policy not to pay for drugs that are not approved by FDA.

## CONCLUSIONS OF LAW

1. All manufacturers of drugs must register with the FDA and must submit a list of all drugs they manufacture. 21 U.S.C. §§ 360(b)–(c), 360(j).

2. Drug manufacturers are subject to inspection by the FDA. 21 U.S.C. § 374.

3. Pursuant to the FDC Act, pharmacies that operate within the boundaries of the traditional practice of pharmacy are exempt from certain registration and inspection requirements. 21 U.S.C. §§ 360(g)(1), 374(a)(2)(A).

4. The exemption from the registration and inspection provisions extends only to pharmacies that are "regularly engaged in dispensing prescription drugs ... upon prescription of practitioners licensed to administer such drugs ... to patients under the care of such practitioners licensed to administer such drugs ... to patients under the care of such practitioners in the course of their professional practice." 21 U.S.C. §§ 360(g)(1), 374(a)(2)(A).

5. The exemptions pursuant to the FDC Act expressly do not apply to pharmacies that "manufacture, prepare, propagate, compound, or process drugs or devices for sale other than in the regular course of their business of dispensing or selling drugs or devices at retail." 21 U.S.C. §§ 360(g)(1), 374(a)(2)(A).

6. Drugs compounded in pharmacies are not exempt from the adulteration, misbranding, and new drug provisions of the FDC Act. *See* 21 U.S.C. §§ 351–32, 355.

■ 7. The FDC "Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health ..." *United States v. An Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969).

8. The FDA in exercising its enforcement discretion has enforced the FDC Act against pharmacies that exceeded the bounds of traditional pharmacy practice. *See generally United States v. Sene X Eleemosynary Corp.,* 479 F.Supp. 970 (S.D.Fla.1979).

9. The APA defines rules as "the whole or a part of an agency statement of general or particular applicability and future effect designated to implement, interpret, or prescribe law or policy ..." 5 U.S.C. § 551(4).

10. Substantive, legislative, interpretative rules, and statements of policy are all treated as rules under the APA definition. 5 U.S.C. § 551(4).

11. Substantive rules are subject to the notice and comment requirements of the APA. 5 U.S.C. § 553(b).

■ 12. Pursuant to the APA, interpretive rules and statements of policy are not subject to the rule-making requirements.

■ 13. Substantive rules establish binding norms that have the force of law. *Pan-*

*handle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin.,* 847 F.2d 1168, 1174 (5th Cir.1988).

14. Interpretive rules do not create law, grant or deny rights, or impose obligations which do not already exist by statute. *Levesque v. Block,* 723 F.2d 175, 181 (1st Cir. 1983).

■ 15. Interpretive rules only apprise affected individuals of existing duties. *Metropolitan School Dist. v. Davila,* 969 F.2d 485, 488–89 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993).

16. Interpretive rules do not determine the rights of private parties or conclusively resolve issues. *Avoyelles v. Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 908–09 (5th Cir.1983).

■ 17. Interpretive rules explain or define particular terms in a statute; they are statements as to what an agency thinks the statute means. *Brown Express, Inc. v. United States,* 607 F.2d 695, 700 (5th Cir.1979).

■ 18. Statements of policy, comparable to interpretive rules, are not intended to have the force of law. *See Pacific Gas & Electric Co. v. Federal Power Comm'n,* 506 F.2d 33, 38 (D.C.Cir.1974).

19. Statements of policy do not create legal rights or obligations between an agency and members of the public. *Id.*

■ 20. Statements of policy merely guide the future exercise of agency discretion by advising agency officials, staff, and the public of the manner in which the agency intends to exercise a discretionary power. *Brown Express, Inc.,* 607 F.2d at 701.

21. A policy statement is distinguishable from a substantive rule in part in that it leaves agency decision-makers free to exercise their discretion. *American Trucking Ass'n, Inc. v. ICC,* 659 F.2d 452, 463 (5th Cir. Unit A 1981), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983); *see also Community Nutrition Institute v. Young,* 818 F.2d 943, 946 (D.C.Cir.1987).

■ 22. Although a substantive rule establishes a standard of conduct that has the force of law, a general statement of policy does not. *Pacific Gas,* 506 F.2d at 38.

23. CPGs are general statements of agency policy that are not subject to rule-making procedures. *Southeast Minerals, Inc. v. Harris,* 622 F.2d 758, 766 (5th Cir. 1980).

24. The factors listed in CPG 7132.16 are not finally determinative of whether a particular pharmacy is violating the FDC Act but merely provide guidance for FDA agents in determining possible violations, within their discretion.

25. Warning letters issued by the FDA are deemed to be informal communications that do not constitute final agency action. *See Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1378 (9th Cir.1983).

26. Warning letters merely establish a dialogue between the FDA and the pharmacist and do not necessarily lead to further sanctions.

27. CPG 7132.16 does not constrain the FDA's enforcement discretion. *Community Nutrition,* 818 F.2d at 948.

28. CPG 7132.16 does not mandate that any pharmacy be automatically subjected to enforcement action, nor does it provide that the agency "shall" do anything.

29. Where an agency remains free to exercise its enforcement discretion, the fact that an agency pronouncement may have some substantive impact does not transform the pronouncement into a binding regulation. *See Panhandle Producers v. Economic Regulatory Admin.,* 822 F.2d 1105, 1110 (D.C.Cir.1987); *United States v. Kast Metals Corp.,* 744 F.2d 1145, 1156 (5th Cir.1984).

30. Simply because FDA employees, in informal communications, may have refereed to the CPG 7132.16 as something to be "enforced" does not transform the CPG into a binding regulation with the force and effect of law. *Community Nutrition,* 818 F.2d at 947–48.

31. The Court finds that CPG 7132.16 is an interpretative statement or policy statement and not a substantive rule subject to the notice and comment requirements of the APA.

32. The FDA's issuance of CPG 7132.16 did not cause HCFA to alter its policy regarding reimbursement for prescription drugs.

33. Any finding of fact which might be deemed to be a conclusion of law is hereby incorporated into these conclusions of law.

34. P2C2's request for injunctive and declaratory relief is hereby DENIED.

### FINAL JUDGMENT

As the Court has previously entered findings of fact and conclusions of law in the above-referenced cause, it is

ORDERED that judgment be entered in favor of defendants. Plaintiff Professionals and Patients for Customized Care's request for permanent injunction and for costs and attorneys fees is DENIED.

. All other relief not specifically granted is hereby DENIED.

This is a FINAL JUDGMENT.