**BELLARNO INTERNATIONAL LTD., Plaintiff,**

v.

**FOOD AND DRUG ADMINISTRATION, Richard R. Klug, Director, Import Operations, and Joseph Faline, Director, New York Import District, Defendants.**

No. 86 CV 3438.

United States District Court,
E.D. New York.

Jan. 4, 1988.

Robert Ullman, Bass & Ullman, New York City, for plaintiff.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y., David M. Nocenti, Asst. U.S. Atty., Margaret A. Cotter, Asst. Director, Office of Consumer Litigation, Civ. Div., Dept. of Justice, Washington,

D.C., Thomas Scarlett, Chief Counsel, Arthur N. Levine, Deputy Chief Counsel and Sandra Barnes, Asst. Chief Counsel, for Enforcement, Food & Drug Admin., for defendants.

McLAUGHLIN, District Judge.

This is an action challenging a policy of the Food and Drug Administration ("FDA") that automatically detains pharmaceuticals made in the United States, exported for foreign sale, and then offered for reimport in the United States. The parties have cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56.

FACTS

Plaintiff Bellarno International, Ltd. ("Bellarno") is a New Jersey corporation engaged in the business of importing various types of merchandise, including certain over-the-counter ("OTC") pharmaceuticals, commonly known as "American Goods Returned" ("AGR" or "reimport") pharmaceuticals. The designation "American Goods Returned" is a tariff classification that designates goods initially produced in the United States, exported for distribution abroad, and subsequently returned for sale in the United States.

In February 1986, pursuant to an offer from C. Parsram & Company, a Singapore company, Bellarno purchased 7920 bottles of Bufferin aspirin tablets and 3888 bottles of Excedrin extra strength pain reliever tablets. The Bufferin and Excedrin products are labelled as having been manufactured in the United States by the Bristol Myers Company. The products were designated for import in five lots as "American Goods Returned."

On March 27, 1986 the goods arrived at their United States port of entry in New York. Notices of sampling were issued by the FDA on April 10, 1986, and the FDA collected samples of the Excedrin and Bufferin products from each lot. On April 22, 1986, the FDA issued Notices of Detention and Hearing for the products.

The Notices of Detention and Hearing state, *inter alia*, that "examination of samples or other evidence indicates that the above described shipment ... appears to be in violation of the Food, Drug & Cosmetic Act (Section 801(a)) and other related acts ..." The Notices also state: "Conclusions: The article is violative within the meaning of § 801(a)(3) in that it appears that the item is a new drug without an effective [new drug application]; and is adulterated within the meaning of [21 U.S.C. § 351] and misbranded within the meaning of [21 U.S.C. § 352]."

After receiving the FDA's Notices of Detention, Bellarno conducted an examination of the Bufferin and Excedrin products to determine whether the goods appeared to violate the Act. Bellarno's examination revealed no basis for a finding that the products were new, adulterated or misbranded drugs.

The FDA notified Bellarno that it had automatically detained the five lots pursuant to the terms of Import Alert # 66–14. Import Alert # 66–14 was issued by the FDA on September 9, 1985 without prior notice-and-comment procedures. Formal notice of the import alert was given on January 8, 1987, when the FDA published the alert in the Federal Register. *See* 52 Fed.Reg. 706–07 (1987).

Import Alert # 66–14 states, in relevant part:

GUIDANCE

Automatically detain all entries of 'American Goods returned' pharmaceuticals (bulk & dosage form drugs) charging: "The article is violative within the meaning of 801(a)(3) in that it appears the item is a new drug without an effective new drug application as required by Section 505(a); and is adulterated within the meaning of Section 501; and is misbranded within the meaning of Section 502." No entry that has been automatically detained shall be released unless and until the owner or consignee (importer) establishes all of the following:

1) A complete chain of custody of the drug products from the time of exportation until they were imported as American Goods Returned pharmaceuticals ...;

2) The goods were manufactured in the United States ...;

3) The expiration date has not been exceeded;

4) There is a satisfactory reason for return of the goods ...; and

5) There is no adulteration and/or misbranding of the goods. Each lot must be examined by a reputable private laboratory at the owner/importer's expense....[1]

To comply with the FDA's conditions for import, Bellarno requested a paper chain of custody from the Singaporan seller of the Bufferin and Excedrin goods. The seller refused to supply such information in order to maintain the confidentiality of the merchandise's source.

In order to satisfy the FDA's concerns, and as part of its written response to the Notices of Detention, Bellarno offered to test the merchandise for safety and purity to confirm its compliance with FDA's requirements instead of providing chain of custody documentation required by Import Alert # 66–14. Plaintiff's proposal was reviewed by the FDA's Import Operations Branch and declined by letter dated August 11, 1986.

Plaintiff then commenced this action. It alleges that the automatic detention of all AGR pharmaceuticals and the imposition of requirements contained in Import Alert # 66–14 exceed statutory authority under 21 U.S.C. § 381; the FDA's detention and imposition of requirements on AGR pharmaceuticals is arbitrary and capricious under 5 U.S.C. § 706(2)(A); and that Import Alert # 66–14 was issued unlawfully and not in compliance with 5 U.S.C. § 706(2)(D). On February 9, 1987, the FDA issued Notices of Refusal, refusing admission of the goods and demanded that the goods be exported or destroyed within ninety (90) days therefrom. The United States Customs Service has agreed to stay the re-export or destruction pending the outcome of this action.

**1.** On October 1, 1985, May 1, 1986 and August 6, 1986, the Alert was reissued without notice-and-comment procedures. In addition to the pre-existing requirements, the revised Alert requires

## DISCUSSION

*I. The Proper Characterization of Import Alert # 66–14*

Bellarno alleges that the FDA violated the Administrative Procedures Act ("APA") by adopting Import Alert # 66–14 without the notice-and-comment rule making procedures required by 5 U.S.C. § 553. The FDA argues that it was not required to conduct notice-and-comment procedures because Import Alert # 66–14 is an "interpretative rule" or a "general statement of policy" within the meaning of § 553(b)(3)(A).

Section 553 of the APA requires agency rules to be issued only after notice-and-comment procedures are completed. An exception to the procedures is provided when an agency is adopting merely an "interpretative rule" or a "general statement of policy." *See* 5 U.S.C. § 553(b)(3)(A). The question, therefore, is whether Import Alert # 66–14 is a "legislative rule" or either an "interpretative rule" or "general statement of policy."

The Second Circuit described the distinction between legislative rules and interpretative rules aptly when it stated that the distinction "is enshrouded in considerable smog." *Noel v. Chapman,* 508 F.2d 1023, 1030 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975).

Courts generally have used two factors to distinguish between legislative and interpretative rules. First, "unless a pronouncement acts prospectively, it is a binding norm ... Thus ... a statement of policy may not have a present effect: 'a "general statement of policy" is one that does not impose any rights or obligations.' " *American Bus Association v. United States,* 627 F.2d 525, 529 (D.C.Cir. 1980) (quoting *Texaco, Inc. v. FPC,* 412 F.2d 740, 744 (3rd Cir.1969)). Although this factor is not a model of clarity either, the court in *Community Nutrition Insti-*

the importers of AGR pharmaceuticals to conduct, at their own expense, a laboratory test of each lot as a further condition of entry into the United States.

*tute v. Young,* 818 F.2d 943, 946 n. 4 (D.C.Cir.1987) has interpreted it to mean that it is the "binding effect [of the pronouncement], not the timing, which is [its] essence."

The second factor centers on the degree of discretion accorded the agency and its agents in effectuating the pronouncement. *See id.; American Bus, supra,* at 529; *Texaco, supra,* at 744.

Along with these factors, the court must give deference to an agency's own characterization of the pronouncement. *See Community Nutrition, supra,* at 946; *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir.1986). However, as the *Cathedral Bluffs* court points out "there is deference and there is deference ... of far greater importance is the language used in the statement itself." *Cathedral Bluffs, supra,* at 537–38.

■ In sum, therefore, although the courts speak of two criteria, in reality four interrelated factors must be considered: the binding effect of the pronouncement; the degree of discretion accorded the agency in applying the pronouncement; deference to the agency's characterization and the language of the pronouncement itself.

**A. The Binding Effect of the Pronouncement.**

Bellarno argues that Import Alert # 66–14 is a new FDA policy that requires automatic detention and re-export of all imports of AGR pharmaceuticals and removes all enforcement discretion. Prior to September 9, 1985, FDA permitted importation of AGR pharmaceuticals and did not require the importer to furnish the information provided in Import Alert # 66–14.

The FDA, on the other hand, maintains that the Alert has no force and effect of law and, as a result, it "would not and could not rely on the Import Alert to defend its decision to refuse goods." Defendant's Memorandum of Law, at 24. Rather, the FDA argues that "there are no limitations on FDA's authority to initially detain an article offered for import, pending a determination of its admissibility." Defendants' Memorandum of Law at 6. Thus, the FDA apparently relies on its perceived *carte blanche* to detain AGR pharmaceuticals.[2] The FDA also maintains that its decision to refuse admission is grounded in 21 U.S.C. § 381(a), which gives it broad authority to refuse admission if the goods sought to be admitted "appear[ ] from the examination or otherwise" to violate the Food, Drug and Cosmetic Act. 21 U.S.C. § 381(a).

To summarize the government's argument, the FDA detained the goods under its plenary authority, and refused their admission because when Bellarno failed to provide the information required by Import Alert # 66–14, the goods "appeared to violate the Act" and were excludable under § 381(a).[3]

---

**2.** As plaintiff points out, this assertion of blanket authority is belied by the FDA's own Regulatory Procedures Manual. The manual reads in pertinent part:

A. *Evidence Required for Detention*

Every dentention must be based upon evidence pointing to a violation of the Act. This does not mean that comprehensive examinations are required as a condition for detention or that detentions cannot be based upon very brief examinations if these are sufficient to furnish evidence pointing to a violation of the Act.

Furthermore, it is not essential that a detention invariably be based upon examination of a sample, as Section 801(a) provides for detention if "it appears from the examination of such samples or *otherwise*" that the article is violative. *However, in those cases in which detention is made without examination, there should be substantial evidence of a documentary type, to warrant a charge of violation.* Vol. III, FDA Regulatory Procedures Manual, FDA Operational Import Procedures, ch. 9–30–20 (emphasis added).

**3.** In a letter from the government to plaintiff's counsel, this position is made more precise:

FDA's decision to insist on a complete paper chain of custody is based on statutory authority under the Federal Food, Drug, and Cosmetic Act. Under 21 U.S.C. 381, imported products may be refused if they "appear" to be adulterated. A gap in the chain of custody creates an appearance that the drug is adulterated within the meaning of 21 U.S.C. 351(a)(2)(B). A complete chain of custody is needed to establish that a drug product has been stored in accordance with current good manufacturing practice regulations. 21 CFR

Evidence that Import Alert # 66–14 binds the government is found in the government's letter to plaintiff's counsel wherein plaintiff's proposal to test the goods in lieu of supplying documentation was rejected. Significantly, the letter reads "We *can not release* the Excedrin or Bufferin *until all the requirements of the import alert are met.*" Declaration of Kenneth M. Klein in Support of Defendant's Motion for Summary Judgment, Attachment # 4 (emphasis added).

Further evidence of the binding nature of Import Alert # 66–14 is gleaned from a statement made by Frank E. Young, FDA Commissioner to the House Subcommittee an Oversight and Investigations on July 10, 1986. Commissioner Young stated that Import Alert # 66–14

> *placed the burden on the owner or consignee to show that [AGR pharmaceuticals] entries are legal.* Two revisions of the Import Alert have since been issued to further *tighten requirements for reimportation* of drug products.... Since the initiation of our Import Alert in September 1985, until May 1986, 278 prescription (Rx) and OTC drug shipments have been offered for entry. Of these, two lots of Ceclor have been found to have counterfeit labeling. Ninety-four entries were released for sale in this country and 28 entries were refused entry. *The vast majority of these refusals were at the request of the importers because they were unable to supply FDA with the documents as required in the Import Alert. The remaining are still under detention*

> *pending final decision whether the entries fulfill all of the requirements in the Import Alert.*

*Prescription and Drug Diversion and Counterfeiting—Part 2; House Hearings Before Subcomm. on Oversight and Investigations of Comm. on Energy and Commerce*, 99th Cong., 2nd Sess. 82 (July 10, 1986) (statement of Frank E. Young, Commissioner, FDA) (emphasis added).

Notwithstanding FDA's unsupported protestations to the contrary, it is apparent that Import Alert # 66–14 binds not only the agency, but the importers as well.[4]

### B. Degree of Discretion Accorded the Agency

The FDA argues that Import Alert # 66–14 merely is a "statement directed primarily to agency staff advising them how to conduct an agency discretionary function." Citing the declaration of defendant Richard R. Klug, the FDA maintains that the Import Alert is implemented with discretion.

The facts cited by defendant Klug in his declaration illuminate the true, limited nature of the agency's discretion. Klug states that an Import District Office may elect not to detain a lot of goods recalled or reimported as overstock by an original manufacturer. Significantly, the declaration does not go on to state that such an election has ever been exercised. Klug also states that the FDA may release some goods where a complete chain of custody as required by Import Alert # 66–14 is not provided. To support this claim of discre-

---

211.142. The appearance of adulteration persists even if the importer establishes by analysis that a representative sample of the drug is not contaminated or deficient in any way. Adulteration under section 351(a)(2)(B) is based on the conditions of manufacture and storage, not on the actual quality of the drug itself.
Declaration by Kenneth M. Klein in Support of Defendant's Motion for Summary Judgment, Attachment # 4.

**4.** It is clear that by requiring the importer to comply with the terms set forth in Import Alert # 66–14, the FDA has imposed new and substantive obligations. *See Burroughs Wellcome Co.,*

*v. Schweiker,* 649 F.2d 221, 224 (4th Cir.1981) (a statement is a rule when it " 'makes a substantive impact of the rights and duties of the person subject to regulation.' ") (quoting *Reynolds Metals Co. v. Rumsfeld,* 564 F.2d 663, 669 (4th Cir.1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 84 (1978). *See also Noel v. Chapman, supra,* at 1030 (" '[legislative] rules are directed primarily at the public in an effort to impose obligations on them.' ") (quoting Bonfield, *Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy under APA,* 23 Admin.L.Rev. 101, 115 (1970–71).

tion, Klug refers to two separate instances where reimports were released without the chain of custody documents. Given that FDA has processed approximately 386 AGR pharmaceutical entries from the inception of its new policy to January 1987, two separate instances of deviation therefrom can hardly form the basis for a finding of agency discretion.

Further supporting this conclusion is the language of the September 6, 1985 memorandum from Klug released contemporaneously with the Import Alert:

The subject Import Alert which follows is to be enforced *effective Monday, September 9, 1985. There should be no exceptions to strict enforcement.*

(emphasis supplied).

This language suggests that the FDA was creating a substantive rule of general applicability, to which no exceptions would apply, rather than a discretionary general statement of policy.

Even were this Court to find that a modicum of discretion exists, that finding alone is insufficient to classify the pronouncement as a general statement of policy. *See Guardian Federal Savings & Loan v. Federal Savings and Loan Ins. Corp.*, 589 F.2d 658, 667 (D.C.Cir.1978).

### C. The Language of Import Alert # 66–14

As now Justice Scalia stated in *Cathedral Bluffs*, one of the most significant interpreting factors is the language employed by the agency. *Cathedral Bluffs,*

---

**5.** "Shall," as defined in Webster's Third New International Dictionary 2085 (1981), is used "to express a command or exhortation ... in laws, regulations, or directives to express what is mandatory."

**6.** To highlight the significance of language used and the force with which FDA intended to use Import Alert # 66–14, compare the language of the "guidance" issued by the FDA in October 1985 with respect to AGR other than pharmaceuticals:

The following guidance is offered for dealing with all types of "American Goods Returned". While there are legitimate reasons for returning American goods, in many instances the items are returned because they are adulterated and/or misbranded. Violative goods, if not examined, may reenter the United

*supra,* at 537–38. The wording of Import Alert # 66–14, as the FDA apparently concedes, *see* Defendants' memorandum, at 23; Defendants' Reply Memorandum, at 7, is mandatory.

That the Alert is entitled "guidance" by the agency does not mitigate the tone of the language that follows its title. For example, the word "[a]utomatically" is not qualified. Simarily, the agency uses the word "shall" rather than "may".[5] The agency's choice of words is decisive in determining whether a pronouncement is a legislative or an interpretive rule. *See Cathedral Bluffs, supra,* at 538. *Compare Community Nutrition, supra,* at 946 (use of "will" supports determination of legislative rule); *and American Bus, supra,* at 532 (same); *with Guardian Federal, supra,* at 666 (use of "may" supports determination of interpretative rule). The agency's choice of words indicates an intent to treat the Alert as a directive rather than merely a guidance.[6]

### D. Agency Deference

An analysis of the FDA's pronouncement would be incomplete without consideration of the deference generally accorded an administrative agency's characterization of its own statement. *See Cathedral Bluffs, supra,* at 537. Although this deference has been given some weight, analysis of the other criteria militate toward a finding that the pronouncement is not a general statement of policy or interpretative rule, as the FDA argues, but rather is a binding

---

States for distribution without proper reconditioning or relabeling.

All American Goods Returned must be considered suspect (please see Import Alert # 66–14 for coverage of pharmaceutical products.) We suggest that all entries of such products be given serious consideration before they are released. Determine the reason for the return of the goods. The goods should be wharf examined in all cases and sampled for laboratory examination when there does not appear to be a legitimate reason for return of the goods, or when the physicial appearance of the goods indicates possible violations (stained containers, etc.)

If sampling reveals a violation, the goods should be detained with the appropriate charge.

legislative rule that is subject to notice-and-comment procedures.

 After considering these decisive factors, I conclude that the FDA's failure to conduct notice-and-comment rule-making procedures before issuing Import Alert # 66–14 violates the APA, 5 U.S.C. § 706(2)(D), and renders the Alert unlawful.

II. *Whether Import Alert # 66–14 is Arbitrary, Capricious and Issued in Excess of Statutory Authority*

Bellarno asks this Court to go one step further and declare that the alert is arbitrary, capricious and issued in excess of statutory authority. The court is unwilling to make this unnecessary leap for two reasons.

First, a declaration invalidating the Alert adequately achieves the result plaintiff seeks. A judicial determination that the rule is invalid prevents the FDA from automatically detaining and refusing plaintiff's goods on the basis of noncompliance with that rule.

 Second, and most important, Bellarno asks this Court to decide this issue in the abstract. Bellarno argues that since courts, after deciding a pronouncement was an *interpretative rule,* reached the question whether the interpretative rule was arbitrary, capricious or contrary to statutory authority, *see Telecommunications Research & Action Center v. FCC,* 800 F.2d 1181, 1184 (D.C.Cir.1986), that the same logic applies, and the same extension should be made when a court decides the agency's pronouncement is an improperly issued *legislative* rule. Proper notice-and-comment procedures with its corresponding public participation may result in a modification of Import Alert # 66–14. Only after these rule making procedures are completed is the court equipped to decide whether a legislative rule is arbitrary, capricious or issued in excess of statutory authority. *See Batterton v. Marshall,* 648 F.2d 694, 711 (D.C.Cir.1980). Where, as here, agency action is subject to modification, recall, abandonment or reconsideration, judicial review is premature. *See National Trea-*

*sury Employees Union v. Federal National Labor Authority,* 712 F.2d 669, 671 (D.C.Cir.1983); *Dow Chemical v. CPSC,* 459 F.Supp. 378, 387 (W.D.La.1978).

### CONCLUSION

Bellarno's motion for summary judgment with respect to its third cause of action is granted; and the FDA's cross-motion for summary judgment thereon is denied. Bellarno's motion for summary judgment with respect to its first and second causes of action is denied; and the FDA's cross-motion for summary judgment thereon is granted.

SO ORDERED.