Leona BENTEN, on behalf of herself and all others similarly situated, Dr. Louise B. Tyrer, and Lawrence Lader, Plaintiffs,

v.

David KESSLER, in his official capacity as Commissioner of the Food and Drug Administration, Carol Hallett, in her official capacity as Commissioner of the Bureau of Customs, Anthony Liberta, in his official capacity as Regional Commissioner of Customs for New York, and Robert K. Hering, FDA Compliance Officer, Defendants.

No. CV–92–3161 (CPS).

United States District Court, E.D. New York.

July 14, 1992.

The Center for Reproductive Law & Policy by Simon Heller, Rachael Pine, Lynn Paltrow, and Catherine Albisa and Lefrak Newman & Myerson by Marshal Beil, New York City, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., Office of Consumer Litigation U.S. Dept. of Justice by Drake Cutini and Deborah S. Smolover, Washington, D.C. and Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Paul Weinstein, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This was a lawsuit waiting to happen. The record before this Court reveals a history of political and bureaucratic timidity mixed with well-intentioned blundering in dealing with two of the most charged and significant issues of our time: AIDS and abortion. A well-intentioned effort to except personal use of untested AIDS drugs from the new drug testing requirements imposed by Congress was adopted by the

Food and Drug Administration ("FDA") without the notice of rule making and opportunity for comments that such decisions require. The absence of notice and public comment itself resulted in the ill-considered promulgation of an exception to the new drug testing requirements for drugs imported for personal use of such breadth as to include on its face the importation of an abortion drug never before approved for distribution in this country. In the face of political outcry, a retreat was ordered by the FDA, again without the investigation, notice or comment required by law. Now, a plaintiff has taken advantage of this sink of illegality to relieve her own understandable anxieties over employing surgical procedures to end her unwanted pregnancy. She has imported the abortion drug under the personal use exception, alleging that the ban on importation of that drug was illegally promulgated by the FDA.

She is right that the FDA has proceeded illegally, and she is entitled to the narrower relief she seeks, namely, the release of the drug to her. The broader remedy she asks for has not, at this juncture, been demonstrated to be necessary. The still larger question, whether RU486 should be available to women in this country, generally, is not before this Court for decision but should promptly be addressed by the agency assigned the task of resolving it according to the legal procedures mandated by Congress for resolving such issues.

\* \* \*

This action—brought by plaintiffs Leona Benten, Dr. Louise B. Tyrer, and Lawrence Lader, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and 553, 21 C.F.R. § 10.70, and the United States Constitution—seeks to secure the return of a small quantity of the abortifacient drug Mifepristone, known colloquially as RU486, seized by the defendants from two of the plaintiffs on July 1, 1992, at John F. Kennedy International Airport. In addition, the complaint seeks to enjoin the enforcement of a ban on the importation of the drug.

The matter is currently before the Court on an application by plaintiffs seeking preliminary relief in the form of an order directing the immediate return of the drug to Ms. Benten so that she can, under the supervision of her personal physician, Dr. Tyrer, use it to terminate her pregnancy prior to July 18, 1992, after which date the drug can no longer be employed for that purpose. In addition, plaintiffs seek an order restraining defendants from implementing a ban on the importation of RU486 pending the trial of this action.

This matter is being determined on the basis of the papers, including affidavits from the plaintiffs and others, submitted by both sides without an evidentiary hearing, with the parties' consent.[1]

Having considered the affidavits and exhibits as well as the factual arguments presented both in the papers in support of and in opposition to the motion and at a hearing held on July 10, 1992, I find that plaintiffs are entitled to part of the emergency relief they seek, that is, the return of the medication for the purposes and according to the protocol set forth in plaintiff Tyrer's affidavit of July 6, 1992. The broader preliminary relief sought by the plaintiffs is, at this juncture, denied. What follows sets forth the findings of fact and conclusions of law on which these determinations are based as required by Rule 65(a) of the Federal Rules of Civil Procedure.

## BACKGROUND

Plaintiff, Leona Benten, is a twenty-nine-year-old resident of California who is currently in her seventh week of an unwanted pregnancy. She has been pregnant before and in mid–1983 underwent a surgical abortion in a hospital ward in Oakland, California, under general anaesthesia.

Shortly after Ms. Benten became aware of her pregnancy, she consulted with her gynecologist, plaintiff Louise Tyrer, a physician licensed in New York and California

---

1. Where a party against whom an injunction is sought is "demonstrably 'content to rest' on affidavits submitted to the court," no evidentiary hearing is necessary. *Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 748 (2d Cir.1987); *see also Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.1989).

and Board Certified in Obstetrics and Gynecology, to determine if she could terminate her pregnancy by medical means not involving surgery. After appropriate testing and examination, Dr. Tyrer, who, I find, is fully familiar with the uses, protocols for use, contraindications, and side effects of the drug, determined that Ms. Benten was an appropriate candidate for the administration of Mifepristone, known as RU486.

RU486 is a medical abortifacient approved and in general use in Great Britain and France, where, it is reported to have extraordinary success in achieving complete abortion and to pose acceptable health risks. L. Silvestre et al., "Voluntary Interruption of Pregnancy with Mifepristone (RU 486) and a Prostaglandin Analogue: A Large–Scale French Experience," 322 New England J. Med. 645 (1990); Michael Klitsch, Antiprogestins and the Abortion Controversy: A Progress Report, 23 Fam. Plan.Persp. 275 (1991).

RU486 is only recommended for use under medical supervision. It can be used to induce an abortion without surgical intervention or hospitalization. Therefore, RU486 abortions can be done in the privacy of one's home. However, RU486 is only recommended for use during the first eight weeks of pregnancy. The procedure involves the ingestion of 600 milligrams of Mifepristone on an empty stomach, followed forty-eight hours later by the ingestion of Cytotec (or another prostaglandin), a prescription drug generally available in the United States. The amniotic sac is generally passed as part of a flow of blood and clots several hours after the second medication is taken.

Surgical abortion (the alternative method of ending pregnancy commonly used in the United States) is not generally recommended until the eighth week of pregnancy. Surgical abortion is generally performed at a clinic or hospital.[2]

Having explained the procedure, the risks of failure, and side effects of RU486 and having obtained plaintiff Benten's consent, Dr. Tyrer prescribed the requisite dosage. Plaintiff Benten, in the company of plaintiff Lader, traveled to London, where they filled the prescription. On July 1, having alerted defendants that she would be arriving with the drug and would be seeking to import it under an exception to the ban on the importation of untested drugs described more at length hereinafter, she was met at Customs by representatives of the FDA and of Customs who seized the drug and furnished plaintiff Benten with a notice of detention describing as the "Reason for Detention[:] Automatic Detention, Alert 66–47, RPM."

### Regulatory Scheme

In order to understand the legal morass in which the FDA has fallen in this area, it is necessary to have some understanding of how new drugs such as RU486 are regulated in this country. As a general matter, such drugs must be approved by the FDA before they may be distributed in the United States under the Federal Food, Drug and Cosmetic Act. ("FDCA"), 21 U.S.C. §§ 301 et seq. However, since Congress has not given the FDA the resources or the authority to conduct the large-scale laboratory, animal, and human studies necessary to determine the safety and effectiveness of new drugs, the burden has been placed on drug companies to come forward, spon-

---

2. The procedure has been described as follows:
   Before dilating the uterus, the size and location of the uterus is determined by clinical examination. The vagina, vulva and cervix are scrubbed....
   Dilation of the cervix is next accomplished using Hegar's or Pratt dilators, cylindrical instruments employed to probe and dilate the cervix....
   Once the cervix is dilated adequately, the uterus is evacuated....
   ... [A] suction curette aspirator will be introduced into the uterus after cervical dilation.

When the tube is inserted into the uterus, it is drawn back and forth from the fundus or upper portion of the uterus to the cervix or lower portion and rotated in all directions.... If parts of the placenta or fetal parts remain in the body, they may be removed with a sharp curet. Complete removal of the fetus is always mandatory ... to avoid continued bleeding and infection.
Roscoe N. Gray, Attorney's Textbook of Medicine ¶ 311.84(1) (3rd ed. 1991).

sor the drug, and test it, submitting either a new drug application, 21 U.S.C. § 355(a)–(d), or an investigational new drug application, 21 U.S.C. § 355(i), to obtain FDA approval.

The FDA possesses the authority to prohibit the importation of drugs not approved pursuant to this process, 21 U.S.C. § 381(a)(3), although it also possesses the authority in its discretion to allow the importation of new drugs which have not gone through this approval process. *Id.; Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Community Nutrition Inst. v. Young,* 818 F.2d 943, 950 (D.C.Cir.1987).

In July 1988, the FDA exercised this discretion compassionately to promulgate a revision of its Regulatory Procedures Manual ("RPM") addressing the situation of persons suffering from the AIDS epidemic and persons suffering from cancer who sought to import by mail small doses of untested drugs from abroad for personal use for their conditions under the supervision of their physician, in situations in which there was no reason to suspect that the persons were the victims of quacks or that the drugs posed an unacceptable risk to health. This program was announced as a temporary change in the regulations generally prohibiting the importation of unapproved drugs, and the announcement stated that, if the project "proves successful, with no significant problems, Chapter 9–71 of the Regulatory Procedures Manual may be appropriately revised." Pilot Guidance, July 20, 1988, Exhibit A to the Complaint.

On September 26, 1988, foreshadowing the administrative confusion which has characterized latter stages of this dispute, the FDA issued Import Alert 66–813, stating that the July 20, 1988 pilot program on mail importations did not apply to RU486, presumably because the drug has nothing to do with the treatment of AIDS or cancer.

Neither the July 20 or the September 26 revisions of agency practice were published for public comment before their promulgation. Nor, as far as this record shows, were they the product of any investigative proceeding by the agency. Perhaps this failure may be explained by their "pilot" or temporary nature.

In all events, the pilot program was apparently judged successful and led, on February 1, 1989, to a formal revision of the agency's RPM. This revision expanded the pilot program to a substantial exception to the new drug approval procedures, no longer confined to AIDS or cancer drugs, which became known as the personal use exception. Not only was the pilot program expanded from mail imports to imports in personal luggage, the new *laissez-faire* approach included as well drugs for all life-threatening or serious conditions whether or not AIDS-related or the result of cancer, as well as less than serious medical conditions where the product "is not known to represent a significant health risk." The RPM reads in pertinent part as follows:

> In deciding whether to exercise discretion to allow personal shipments of drugs or devices, FDA personnel should consider a more permissive policy in the following situations:
>
> > when the intended use is appropriately identified, such use is not for treatment of a serious condition, and the product is not known to represent a significant health risk; or
> >
> > when (1) the intended use is unapproved and for a serious condition for which effective treatment may not be available domestically either through commercial or clinical means; (2) there is no known commercialization or promotion to persons residing in the United States by those involved in the distribution of the product at issue; (3) the product is considered not to represent an unreasonable risk; and (4) the individual seeking to import the product affirms in writing that it is for the patient's own personal use (generally not more than three months supply) and provides the name and address of the doctor licensed in the U.S. responsible for his or her treatment with the product or provides evidence that the

product is for the continuation of a treatment begun in a foreign country. RPM 9–71–30(C).

Once again, no notice was given of the agency's intent to adopt this major revision in the agency's regulatory stance towards unapproved drugs, nor was comment invited either before or after it was adopted. Nevertheless, unsolicited comment from those close to the situation was not long in arriving.

On May 5, 1989, Congressmen Robert K. Dornan, Henry Hyde, and John LaFalce sent a letter to the then Commissioner of the FDA. After referring to a December 1988 article in *American Health*, "Mail Order Drugs from Abroad," which apparently discussed an FDA policy allowing the shipment to the United States of certain unapproved drugs, the letter stated:

> While this apparent blanket policy is *prima facie* disturbing overall, one specific concern is that the French abortifacient RU 486 is not one of the 40 drugs specifically excluded. We are aware of the September 26, 1988 memo signed by Burton I. Love [Alert 66–813] but we have seen no official statement from you confirming the ban on RU 486.
>
> The U.S. government should not be involved in abetting abortion. This includes regulations that would allow the use of abortifacients such as RU 486. But of equal importance, the FDA should look at the effects non-approved drugs may have on the health and welfare of U.S. citizens. RU 486 has more than a dozen "contra indications" which proscribe its use.... How then could the FDA possibly allow its to be purchased through mail order?!

One month later and following correspondence from other legislators complaining of the failure to bar RU486 from the personal use exception, on June 6, 1989, the FDA issued Import Alert 66–47, the basis

for the seizure in this case. The alert stated that RU486 was subject to "automatic detention" and that agents should "[a]utomatically detain all shipments of unapproved abortifacient drugs." The reason set forth in the alert for its issuance is that—

> [q]uestions have been raised about a new abortifacient product, RU486 or "Mifepristone", Import Bulletin 66–813 (9/26/88) and whether the agency should use its discretion, pursuant to the Pilot Guidance for Release of Mail Importations (7/20/88), or otherwise, to allow its importation for personal use. FDA has concluded that unapproved products of this kind would be inappropriate for release under the personal importation policy. The intended use of such drugs could pose a risk to the safety of the user.

Import Alert 66–47.

It is, perhaps, unnecessary to note, given the prior history, that no notice and comment procedures preceded or followed this reversal by the agency. While the reason given for the ban that "[t]he intended use of such drugs could pose a risk of safety to the user" hardly serves to distinguish the drug from other drugs approved for importation under the personal use exception where the risks are "reasonable" or not "significant," it appears much more likely from the history outlined above that the decision to ban the drug was based not from any bonafide concern for the safety of users of the drug, but on political considerations having no place in FDA decisions on health and safety.[3]

## DISCUSSION

■ The first issue is the availability of judicial intervention before the issues raised here are presented to the FDA and

---

3. This conclusion is supported by the range of differing after-the-fact rationales which have been offered by the agency, caught in the web of its own making, to Congressmen and the Court, the paucity of independent inquiry to support any of its proposed rationales, and the limited time taken by the FDA to consider the issue.

*See* RU486: The Import Ban and its Effects on Medical Research, Hearings Before the Subcommittee on Regulation, Business Opportunities and Energy of the House Committee on Small Business, 101st Cong., 2d Sess. (Nov. 19, 1990). Exh. H to Complaint.

all administrative procedures exhausted. Exhaustion is a flexible doctrine.

This Court's precedents have recognized at least three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion. First, requiring resort to the administrative remedy may occasion undue prejudice to subsequent court action. Such prejudice may result ... [when] a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of [her] claim.... Second, an administrative remedy may be inadequate because of some doubt as to whether the agency was empowered to grant effective relief.... Third, an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it.

*McCarthy v. Madigan,* —— U.S. ——, ——–——, 112 S.Ct. 1081, 1087–88, 117 L.Ed.2d 291 (1992).

The impounded medication will be of use to Ms. Benten only if taken by July 18, 1992. She, therefore, is entitled to the first exception. In addition, the facts discussed above at the least suggest the possibility of predetermination of the issue by the FDA, thus triggering the third exception. This Court, therefore, will proceed to the merits of the request for a preliminary injunction.

■ To obtain a preliminary injunction, the moving party in most cases "must establish (1) irreparable injury and (2) a likelihood of success on the merits or a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 136 (2d Cir.1992). However, if granting the preliminary injunction provides the movant with essentially all the relief requested, the standard is higher; the movant must show a substantial likelihood of success on the merits, as opposed to a mere likelihood of success. *Johnson v. Kay,* 860 F.2d 529, 540 (2d Cir.1988); *Vestron, Inc. v. National Geographic Society,* 750 F.Supp. 586, 590 (S.D.N.Y.1990).

Ordering defendant to return the seized medication to Ms. Benten would provide her with all the relief she requests upon the final adjudication of the action. Therefore, at least as to her, the higher standard is appropriate.

■ Irreparable injury is present.[4] Without the medication, Ms. Benten will have to undergo an invasive surgical procedure which she has experienced before and does not want to go through again. There is no reason to doubt the bonafides of her desire to avoid anaesthesia to undergo the procedure sooner rather than later or her desire to undergo the process of terminating her pregnancy in the privacy of her doctor's office and her home rather than in a hospital or abortion clinic. Without characterizing Ms. Benten's choice of *method* of terminating her pregnancy as a right, much less a constitutional right, it is certainly appropriate to pay some considerable deference to the individual who must make the choice and undergo the procedures, rather than attempting to evaluate the injury to another from the perspective of an observer judging the reasonableness of plaintiff's views.[5]

Defendants suggest that no irreparable injury exists because the injury is the pregnancy, and that injury can be avoided, if it must be, by surgical means. As noted, that is not the irreparable injury at issue.

---

4. Defendants have not, at any point, questioned whether plaintiff Benten may be subjecting herself to an unacceptable risk of injury in using the medication. Indeed, defendants' counsel went out of his way to offer to return the drug to plaintiff for use in some other country, a somewhat paradoxical position given the safety concerns defendants have voiced in other contexts.

5. A sufferer's subjective description of her own anguish is credible evidence entitled to some deference. This is especially true when it is based on an objectively ascertainable condition and no credible contrary evidence is presented. *See, e.g., Harris v. Railroad Retirement Bd.* 948 F.2d 123, 126 (2 Cir.1991); *Conley v. Bowen,* 859 F.2d 261, 261 (2d Cir.1988); *Gallagher by Gallagher v. Schweiker,* 697 F.2d 82, 84–85 (2d Cir. 1983).

Defendants also suggest that the injury is self-inflicted because (1) plaintiff could have taken the drug abroad under the supervision, presumably, of a British doctor, (2) she could even now re-export the drug to Great Britain or France with herself and her doctor and take the drug there, or, finally, (3) she could have somehow obtained the drug in this country under other programs for the experimental testing of the drug. The first two proposals merit little discussion. The FDA itself emphasizes in its personal use exception in general and in its after-the-fact expressions of concern over the safety of RU486 in particular the need for medical supervision and the need to ensure that the medical supervision will be skilled and conscientious. Plaintiff can hardly be faulted for relying on her own physician, in her own state, to perform the supervision necessary to ensure a safe and successful outcome, particularly given the known qualifications of Dr. Tyrer and the failure of the government to suggest the availability of any physician in Great Britain or France prepared to assist the plaintiff.[6] To suggest that Dr. Tyrer should take herself away from her other patients to care for Ms. Benten in a hotel room in Paris or London mistakes the role of equity. "Equitable remedies are a special blend of what is necessary, what is fair, and what is workable.... The qualities of mercy and practicality have made equity an instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Lemon v. Kurtzman*, 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (per Burger, C.J.) (quotations omitted, citations omitted). *See also Republic of the Philippines v. New York Land Co.*, 852 F.2d 33, 36 (2d Cir.1988).

With respect to the suggestion that plaintiff has failed to demonstrate why she could not have found a place in clinical trials currently being conducted, no showing has been made that plaintiff was even aware of these programs, that they are currently open to persons such as plaintiff, that she fits whatever profiles have been developed for the clinical trials, or that she would have been accepted. Accordingly, I turn to the merits.

■ At issue, at least initially, is the legal characterization of Import Alert 66–47, pursuant to which the drug was seized. If it is a substantive rule, notice and comment procedure was mandatory. 5 U.S.C. § 553(b); 21 C.F.R. § 10.40.

> A 'substantive regulation' is one which 'grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests.' Such a regulation may be compared with an 'interpretative' regulation, which is simply an agency's 'intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activity.'

*Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir.1991) (construing 5 U.S.C. § 553) (citation and internal quotations to case omitted).

An FDA pronouncement almost identical to the one now at issue was held a substantive rule in *Bellarno Intern. Ltd. v. FDA*, 678 F.Supp. 410 (E.D.N.Y.1988). That case involved a document captioned "Import Alert # 66–14" and "Guidance." Its operative words were "[a]utomatically detain all entries of 'American Goods returned' pharmaceutical." *Id.* at 411. After a scholarly discussion of the relevant law, the *Bellarno* court listed the relevant criteria as four interrelated factors:

> The binding effect of the pronouncement; the degree of discretion accorded the agency in applying the pronouncement; deference to the agency's characterization and the language of the pronouncement itself.

*Id.* at 413.

The language of Alert 66–47 issued June 6, 1989, was that of an order: "[a]utomati-

---

**6.** Indeed, it appears that France is out of the question since a United States citizen must reside in France for three months to be entitled to the use of the drug in that country. *See* Irving

Spitz and C. Wayne Bardin, M.D. "RU486" at p. 34, Exh. B to the Affidavit of Wayne Bardin, M.D., sworn to July 9, 1992.

cally detain all shipments of unapproved abortifacient drugs." This is identical to the opening of the rule in *Bellarno*. Furthermore, while the FDA argued (unsuccessfully) in *Bellarno* that the use of the heading "guidance" diffused "automatically detain," *id.* at 415, no such language appears in Alert 66–47. Because of this language the agents receiving it had no discretion.

The government unsuccessfully tries to distinguish *Bellarno*. First, it argues that no obligation was created by the alert as (1) the plaintiff never had any right to import RU486 for personal use, and (2) the alert did not create new duties. As to the first, the government focuses on the wrong right. It argues that, since there was never a statutory right to import RU486, the alert took nothing away. The right at issue, however, was that created in February 1989 by the revision of the RPM. Under the RPM, plaintiff had a right to a case-by-case discretionary decision by the FDA on her personal importation of RU486.[7] After the ban this right no longer existed. While the FDA argues that no discretionary decisionmaker would have allowed the importation, nothing in its papers supports such a conclusion. As for the point that the alert did not create new duties, it is clear that the ban created a new duty on FDA personnel—the nondiscretionary detention of RU486.

Defendants also boldly seek to take refuge in their failure to follow rule and comment procedures in their promulgation of the personal use exception, apparently arguing that two wrongs make a right. The fact that the inception of a program "was procedurally faulty or without specific congressional authorization ... has no effect on the applicability of the notice and comment requirement" to its termination.

*Vigil v. Rhoades,* 746 F.Supp. 1471, 1481 (D.N.M.1990) (issuing injunction that terminated program be reinstated), *aff'd,* 953 F.2d 1225 (5th Cir.1992), *pet. for cert. filed,* 60 U.S.L.W. 3816 (May 14, 1992). The personal use exception is not a nullity, as presumably the cancer victims and AIDS patients who have availed themselves of its provisions would attest, if the FDA were to attempt to repeal these procedures at this stage, without notice and comment, as it has done for RU486.

■ However, even if the ban on RU486 was not a substantive rule, notice and comment procedures were required. The alternatives are that (1) the ban was an interpretive rule, i.e., an agency clarification of preexisting substantive rules, or (2) a rule of agency practice. Under the agency's own rules in effect on the date the alerts were promulgated, notice and comment procedures were required even if the alerts are interpretive rules or agency practices.

> The provisions for notice and comment in paragraphs (b) and (c) of this section will apply to interpretive rules and rules of agency practice and procedure except as provided in paragraph (e) of this section. Paragraphs (b) and (c) do not apply to general statements of policy in the form of informational notices published in the Federal Register or to matters involving agency organization.

21 C.F.R. § 10.40(d) (as in effect prior to May 6, 1991; 56 Fed.Reg. 13757–58, April 4, 1991).

The exceptions in section (e) do not cover the instant material. That section exempts regulations covering food and color additives, (e)(2), animal drug regulations, (e)(3), and situations where—

> the Commissioner determines for good cause that [section (b) and (c) notice and

---

**7.** If the defendants are arguing that the personal use exemption, despite the breadth of its language, was never intended to cover RU486, they are no better off, since the establishment of the personal use exemption was clearly substantive rulemaking (if not an interpretative rule or rule of practice), and the lack of the required notice and comment (assuming anyone could have gleaned from the proposed rule the gloss that RU486 was excluded from it, *cf. Shell Oil Co. v.*

*EPA,* 950 F.2d 741, 750–57 (D.C.Cir.1991)), deprived plaintiffs of an opportunity to protest at that point: (1) the agency's exclusion of the drug, (2) the lack of an administrative record to support the agency's conclusion, and (3) the lack of a rational basis for excluding RU486 while allowing personal use importation of other drugs for other serious and non-serious conditions.

comment] are impractical, unnecessary, or contrary to the public interest. In these cases the notice promulgating the regulation will state the reasons for the determination and provide an opportunity for comment to determine whether the regulation should subsequently be modified or revoked. A subsequent notice based on those comments may, but need not, provide additional opportunity for public comment.

21 C.F.R. § 10.40(e)(1) (as in effect prior to May 6, 1991; 56 Fed.Reg. 13757–58, April 4, 1991).[8]

■ An agency is bound to follow procedures required by its own regulations, even if these regulations were not statutorily or constitutionally mandated. *United States v. Nixon*, 418 U.S. 683, 694–95, 94 S.Ct. 3090, 3100–3101, 41 L.Ed.2d 1039 (1974). "It is axiomatic that an agency is legally bound to respect its own regulations and commits procedural error if it fails to abide by them." *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1315 (D.C.Cir. 1991) (quotations omitted, citation omitted).

Even if, *arguendo*, the ban is not a substantive rule, interpretive rule, or agency practice or procedure, plaintiff has shown a substantial likelihood of success on the merits. "Administrative agencies must articulate a logical basis for their decisions, including a rational connection between the facts found and the choices made." *Detsel by Detsel v. Sullivan*, 895 F.2d 58, 63 (2d Cir.1990) (quotations omitted, citation omitted) (refusing to grant substantial deference to agency interpretation of 42 C.F.R. § 4480).

■ A court must review the agency's decisions based on the record and reasons

given when the decision was made. *Vargas v. INS*, 938 F.2d 358, 363 (2d Cir.1991).

■ The ban represented a change in FDA practice. No administrative record has been placed before this Court setting forth the factual basis for the change. And it is unlikely that any such record exists. A request made pursuant to the Freedom of Information Act for documents that would support such a factual finding was answered with the statement that no such documents exist in FDA's files. The FDA is required by its own regulations to preserve complete files of the bases of "every significant FDA decision on any matter under the laws administered by the Commissioner, whether it is raised formally, for example, by a petition, or informally, for example, by correspondence." 21 C.F.R. § 10.70 "We can hardly accept an agency's reliance on 'evidence' that is itself mere speculation." *Detsel*, 895 F.2d at 64. In the words of the APA, the agency's action is arbitrary and capricious. 5 U.S.C. § 706(2)(A).[9]

## RELIEF

■ The above discussion shows only a substantial likelihood of success in establishing that the ban is invalid. If the ban is invalid, the personal use provisions of the RPM are the applicable rule. The RPM does not require the FDA to allow importation of RU486 for personal use under medical supervision; at most, it allows agents of the FDA discretion to allow such importation on a case-by-case basis. Plaintiffs have raised no argument concerning the invalidity of this requirement or of the RPM itself.

---

**8.** The procedures required by 21 C.F.R. § 10.-40(b), (c), are notice and comment rulemaking similar to that required by 5 U.S.C. § 553(b). As of May 6, 1991, the FDA is only required to use notice and comment rulemaking to the extent required by the Administrative Procedures Act ("APA"), 5 U.S.C. § 553. 56 Fed.Reg. 13757, April 4, 1991. However, the ban here was issued before the effective date of the change.

**9.** The FDA also argues that its decision to ban RU486 is beyond any court's power to review. The law is to the contrary. The decision of the

agency which is being reviewed is the change from a case-by-case evaluation of each personal importation of RU486 to a blanket ban. Even if, *arguendo*, the imposition of the ban is substantively unreviewable, the procedure used in making the decision is not unreviewable. *See United States v. Nixon*, 418 U.S. 683, 694–95, 94 S.Ct. 3090, 3100–3101, 41 L.Ed.2d 1039 (1974) (government cannot fire special prosecutor without going through procedure required only by rule it voluntarily created unless it changes the procedural rule first by a proper method).

The preliminary relief being sought is a preliminary injunction against enforcement of the ban, not an injunction requiring the FDA to allow importation of the drug without restriction. Of course, if an FDA agent determines not to allow importation, the owner of the drug has standing to object. FDA regulations have an administrative procedure for hearing such objections. 21 C.F.R. § 1.94. Judicial relief is available if such administrative procedures are unduly delayed. 5 U.S.C. § 706(1).

On the other hand, Ms. Benten is a known litigant faced with a serious timing problem. Unless she takes the dosage of the impounded drug by July 18, 1992, it will no longer be effective or safe for her to do so. Her counsel estimate a full day for the convergence of the drug, Ms. Benten, and her doctor.

In cases where administrative misuse of procedure has delayed relief, the courts have the equitable power to order relief tailored to the situation, not mere remand for agency use of its discretion. *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939) ("the court ... may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action"); *Public Citizen Health Research Group v. Brock*, 823 F.2d 626 (D.C.Cir. 1987) (OHSA's delay in promulgating safety rule allows court to set deadline for agency); *NAACP v. Secretary of Housing & Urban Development*, 817 F.2d 149, 160 (1st Cir.1987) ("A court, where it finds unlawful agency behavior, may tailor its remedy to the occasion."); *Cal–Almond, Inc. v. Yeutter*, 756 F.Supp. 1351, 1356 (E.D.Cal.1991) (dicta, dismissed on other grounds); 5 U.S.C. § 706(1) ("The reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed."). Therefore, the FDA is ordered to immediately release the impounded dosage of RU486 to plaintiff.

No broader decision from this Court is warranted at this time. No adequate showing has been made of a threatened repetition of the injury that Ms. Benten faces. No showing has been put before this Court that others are willing and able to go through the expensive, emotionally draining, and potentially inconclusive hegira that Ms. Benten has gone through. Women tempted to follow Ms. Benten's path are forewarned that they have no assurance that they will have her success. Even assuming the agency in the future exercises its discretion under the personal use policy with respect to RU486, women importing the drug in the future must recognize that that discretion may be exercised against them and that that exercise is in large part unreviewable by the courts.

Nevertheless, the defendants would be well advised to put their administrative house in order, to prepare their representatives in the field to exercise the discretion conferred on them by the personal use policy with respect to RU486 and, if it is truly the opinion of responsible officials at the FDA that the extension of the personal use policy to RU486 was ill-advised, to initiate the investigation, notice, and comment procedures that appear legally required in order to repeal its application in that area.

It may be that the commissioner will seek to follow the emergency provisions of 21 C.F.R. § 10.40(e)(1), but those procedures can only be employed if the commissioner determines that they are appropriate "for good cause" because the requirements of notice and public procedure "are impractical, unnecessary, or contrary to the public interest."

Even in such circumstances, the regulations provide that notice and comment must follow administrative action, and there must exist a bonafide basis in fact for invoking the emergency procedures.

It may well be that the comments on any procedure whether to change the rules or leave them as they are will be raucous and emotional, but in a democracy the best results over the long run flow from adhering to the democratic procedures set forth in the country's laws. Attempts to avoid those procedures, even when engaged in in the best of intentions, do not, in the long run, further the interests of anyone.

For the reasons set forth above, defendants are directed to return forthwith the

RU486 seized from plaintiffs on July 1, 1992, to plaintiffs to be used in the manner and for the purposes set forth in paragraph 14 of the affidavit of Dr. Tyrer dated July 6, 1992. In the event Ms. Benten declines to sign the consent form attached to the affidavit as Exhibit B or if for any other reason the drug is not administered, plaintiffs are directed to return the substance to the defendants to be held subject to further order of this Court.[10]

SO ORDERED.

---

**10.** No bond is requested or required. *Clarkson Co. v. Shaheen,* 544 F.2d 624, 632 (2d Cir.1976); *see also International Controls v. Vesco,* 490 F.2d 1334, 1356 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974).